# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2025-EC-00658-SCT

*COMELIA WALKER*

*v.*

*TIM SCOTT TAYLOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/31/2025 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | KIMBERLY CELESTE BANKS |
| | JOHN PRINCE MARTIN |
| | BARBARA BLACKMON |
| | EDWARD BLACKMON |
| | BRADFORD JEROME BLACKMON |
| | ANGELA TURNER FORD |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ANGELA TURNER FORD |
| | BARBARA BLACKMON |
| | EDWARD BLACKMON |
| | BRADFORD JEROME BLACKMON |
| ATTORNEY FOR APPELLEE: | LISA MISHUNE ROSS |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED - 06/04/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE COLEMAN, P.J., GRIFFIS AND SULLIVAN, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Comelia Walker appeals the circuit court's denial and dismissal of her sworn petitions for judicial review of a primary-election contest. Finding no error, the circuit court's final judgment is affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2.     This is an election contest of the April 22, 2025 Democratic primary runoff election

for mayor of the City of Canton (City). At issue are the registered voters who reside in the Kingston Subdivision, the Westside Trailer Park, and the Trails of Madison, all of which are located within Ward 4 of the City.

¶3. On December 17, 2017, the City annexed two areas in Madison County—the Kingston Subdivision and the Westside Trailer Park. The annexation was upheld by the Court in ***Peco Foods, Inc. v. City of Canton (In re Enlarging City of Canton)***, 317 So. 3d 949 (Miss. 2021). The Trails of Madison is a six hundred-unit, one- and two-bedroom apartment complex developed in an area that has been part of the City since approximately 2007. Although the area in which the Trails of Madison was developed was not annexed in 2017, it remained vacant, and was therefore without registered voters until the completion of The Trails of Madison in 2020.

¶4. On April 17, 2025, a "petition for emergency relief, temporary restraining order and preliminary injunction and writ of mandamus" was filed in the Madison County Circuit Court in ***Crutcher v. Canton Municipal Democratic Executive Committee***.[1] The petition alleged that the annexed areas had not yet been updated into the Statewide Elections Management System (SEMS)[2] to reflect that the registered voters in those areas could vote in municipal elections.

¶5. The circuit court heard the petition on April 21, 2025, one day before the April 22

---

[1] The petitioner, Nancy Crutcher, was represented by the same attorney who represents Walker in this appeal.

[2] "The Statewide Elections Management System updates the municipal voter registration records and assigns electors to their municipal voting precincts." Miss. Code Ann. § 23-15-39(9) (Supp. 2025).

primary runoff election.  The court held as follows:

> The [c]ourt grants the [p]etition in part and denies the [p]etition in part. The [c]ourt rejects the request to enjoin or restrain certification of the election until "the eligible voters residing in the annexed area have been given the opportunity to vote" and to "cast a ballot on a regular voting machine." The newly annexed voters cannot be added to SEMS with less than twenty-four hours' notice and allowed to "cast a regular ballot on the voting machine." Further, there is no reason to extend voting beyond Tuesday, April 22, 2025.

> The [c]ourt grants the [p]etition and the [w]rit of [m]andamus in that *any eligible voter from the annexed area may vote by affidavit ballot in the runoff election on Tuesday, April 22, 2025*. Further, the Canton Municipal Democratic Executive Committee must not void the affidavit ballot simply because the address is not in SEMS.

> The voter must submit identification as required by [Mississippi Code Section] 23-15-563 [(Rev. 2024)]. *The Canton Municipal Democratic Executive Committee must count any valid affidavit ballot in the newly annexed area of the Canton City Limits, to include the Trails of Madison, the Kingston Subdivision, and . . . the Westside Trailer Park*, as eligible ballots in the runoff primary election on Tuesday, April 22, 2025. *These ballots must not be excluded or voided simply because the address is not registered on SEMS.*

(Emphasis added.)

¶6.     On April 22, 2025, the Democratic primary runoff election was held for mayor of the City.  The two candidates in the primary runoff election were Walker and Tim Scott Taylor. Taylor won the primary runoff election by a margin of forty-three votes.[3]  A total of thirty-two affidavit ballots were cast in Ward 4.

¶7.     Walker requested a ballot-box examination.  That examination was conducted over the course of two days beginning May 7, 2025.

¶8.     Aggrieved by her loss, Walker filed a "petition to contest primary runoff election

---

[3] Taylor was ultimately elected mayor of Canton in the general election on June 3, 2025.

3

results" with the Canton Municipal Democratic Executive Committee. Walker later filed an original, an amended, and a second amended "petition for judicial review of primary runoff election contest" in the circuit court. In the petitions, Walker asserted that the City "refuse[d] to provide the Circuit Clerk of Madison County a usable format for adding the residents of the newly annexed area or the Trails of Madison to the voter rolls for the City of Canton elections inclusion in . . . SEMS." She claimed that as a result of the City's failure, multiple voters in those areas were disenfranchised. Walker also asserted, based on her ballot-box examination, various irregularities that she alleged "materially affect[ed] the integrity of the April 22 . . . election." Walker asked that the circuit court declare the April 22 primary runoff election results void and order a new election.

¶9. Beginning May 21, 2025, the circuit court conducted a two-day hearing before a tribunal consisting of the circuit judge and the duly summoned election commissioners. After the hearing, the circuit court entered its findings of fact and conclusions of law, stating in part as follows:

> The [c]ourt finds that [Walker] did not meet her burden to show that the failure of election officials to complete their update of SEMS resulted in registered voters not being allowed to vote in the Canton city elections. There was no reliable proof offered by her to show the actual number of voters within the affected annexed area, and no proof offered to show how many of those affected voters had not received updated voter registration cards after being successfully updated into SEMS.
>
> . . . Taylor, who had no burden of proof in this case, pointed out that [Walker] could have either subpoenaed the circuit clerk to ascertain and bring to court the number of updated voter registration cards issued to those voters, or filed a freedom of information act request for that data. Similarly, Taylor asserted that . . . Walker could have subpoenaed data from the City of Canton showing the number of the newly annexed taxpayers who received municipal

4

tax bills for years from the city after annexation. Those who owned land or a car and had paid ad valorem taxes had seen their tax bills go up considerably for several years as newly tax-paying residents of Canton, and were surely aware they were citizens of Canton and thus eligible to vote there. Mayor [William] Truly testified they had all been added efficiently to the tax rolls.

In the Tribunal hearing no proof was offered, or allegations made, that illegal votes were cast or legal votes were not counted. The will of the voters could be ascertained, and that will clearly shows that . . . Taylor won the election. The Five Election Commissioners agree with these Findings. For all the reasons stated above, this [c]ourt finds [Walker]'s [s]worn [p]etitions for [j]udicial [r]eview of [p]rimary [e]lection [c]ontest are therefore denied and dismissed with prejudice[.]

(Footnotes omitted.) The court entered a separate final judgment that denied and dismissed with prejudice Walker's sworn petitions. Walker timely appealed.

¶10. On appeal, Walker argues: (1) a new election must be held because many potential voters were disenfranchised, (2) requiring the annexed voters to vote by affidavit violated their right to equal protection under the law, and (3) sufficient ballot irregularities called into question the fairness and integrity of the April 22, 2025 runoff.

### DISCUSSION

*I.      Disenfranchisement*

¶11. *Disenfranchisement* is "[t]he act of taking away the right to vote in public elections from a citizen or class of citizens." *Disenfranchisement*, Black's Law Dictionary (12th ed. 2024). Thus, to be disenfranchised is to be deprived of the right to vote. *Id.*

¶12. Under Mississippi Code Section 23-15-39(9),

In any case in which the corporate boundaries of a municipality change,

5

whether by annexation or redistricting, the municipal clerk[4] shall, within ten (10) days after approval of the change in corporate boundaries, provide to the county registrar[5] conforming geographic data that is compatible with the Statewide Elections Management System. . . . The county registrar . . . shall update the municipal boundary information into the Statewide Elections Management System. . . . The county registrar shall forward to the municipal clerk written notification of the additions and changes, and the municipal clerk shall forward to the affected municipal electors[6] written notification of the additions and changes.

Miss. Code Ann. § 23-15-39(9) (Supp. 2025).

¶13.    Walker argues the City failed to complete the SEMS update before the April 22 primary runoff election. Specifically, Walker argues the City "failed to provide the necessary information to the [c]ircuit [c]lerk's office and failed to notify in writing the 'new' City residents of their right to vote in municipal elections and the place to do so." According to Walker, "[t]hese violations of Mississippi law disenfranchised the eligible voters in the annexed areas" and mandate a new election. We disagree.

¶14.    Despite her assertions, Walker presented no evidence that "the City annexed an area of [Madison] County and then completely abdicated its duty[.]" Instead, the record reflects that the City, specifically the city clerk, worked with the circuit clerk to update SEMS.

¶15.    Canton City Clerk Chuconna Anderson testified that she received an address library

---

[4] The municipal clerk is also known as the city clerk. *See Municipal*, Black's Law Dictionary (14th ed. 2024) (defining *municipal* as "[o]f or relating to . . . a city").

[5] Here, the county registrar is also the Madison County Circuit Clerk. https://www.madison-co.com/elected-offices/circuit-clerk#:~:text=Anita%20Wray,The%20Clerk%27s%20office%20keeps: (last visited Jun. 2, 2026).

[6] An elector is "[o]ne who is qualified to vote, a voter." *Elector*, Black's Law Dictionary (7th ed. 2000).

for registered voters from the circuit clerk, that she provided the address library to the City board members for review, and that she returned the address library to the circuit clerk. Anderson further testified that during the April 22 primary runoff election, there were issues with voters' names not appearing on the poll books, but there were no issues with the names not appearing in SEMS. She explained that all registered voters are in SEMS and that you can be in SEMS but not appear on the poll books. Importantly, Anderson testified that she was unaware of any voters who were turned away from voting on April 22.

¶16. Madison County Circuit Clerk Anita Wray testified that it was her responsibility to load the election into SEMS and to notify the City when it had been loaded. Wray testified that she had no problems working with Anderson and that for more than one year, efforts were made to update SEMS. Wray explained that SEMS includes addresses, not names, and that an individual is added to SEMS when he or she registers to vote. Wray further explained that the process of adding addresses into SEMS is an "ongoing" and "continuous" process and that when an individual moves, he or she must provide notice of the address change, or he or she will not be on the poll books. If an individual is not on the poll books, however, he or she may still vote by affidavit. According to Wray, the city clerk has access to SEMS and can confirm if an individual is registered to vote. If the individual is registered to vote and not on the poll books, the city clerk can provide the voter an affidavit ballot. Notably, Wray testified that she has not identified one voter who lived in the annexed areas who was denied the right to vote.

¶17. Additionally, Wray testified that in her ten years as circuit clerk, she has never had a

perfect election with no problems or issues. In fact, Wray testified that the issue regarding a voter's name not appearing on the poll books happens in "every election" and is "nothing new." She emphasized that there was nothing to suggest that the process of updating SEMS after the annexation was motivated by fraud or deprived anyone of their right to vote.

¶18.    Then-Mayor Truly testified that in his opinion, numerous voters were disenfranchised because they were not in SEMS. He admitted, however, that he was friends with, contributed to, and endorsed Walker in the April 22 primary runoff election. Truly further admitted that despite his concerns with SEMS and possible voter disenfranchisement,[7] he did not place the issue on the City's agenda or do anything to resolve the issue. And while he testified that he complained about the issue before Walker's loss on April 22, Truly was unable to name a single person to whom he complained.[8] Notably, Truly could not identify anyone who was denied the right to vote because of the "SEMS issue."

¶19.    Walker admitted she was unable to produce a single witness to testify that he or she had been denied the right to vote or that he or she had been disenfranchised.[9] Indeed, Walker

_____

[7] According to Truly, his concerns over SEMS and voter disenfranchisement began in 2024.

[8] Wray testified that Truly never voiced concern or outrage to her regarding voter disenfranchisement.

[9] Patrick Carson testified that he was not allowed to vote on April 22. He explained that he was asked where he lived and that he had to write down where he lived on a piece of paper that he thought was an affidavit. Carson admitted that despite this issue, he never contacted any elected officials to report the problem. The circuit court found Carson's "testimony was without credibility" since he lied under oath about his relationship with Walker. Specifically, Carson testified under oath that he did not know Walker. Walker, however, admitted at trial that Carson was her cousin and that Carson had lied about not knowing her.

8

failed to produce one voter from the annexed areas who claimed to have been deprived of the right to vote. Instead, Walker claimed that "people who we don't know who even showed up at the polls" were disenfranchised "because they did not have notice that they could vote in this municipal election." But Walker did not present any witnesses who testified that they did not have notice that they could vote in the municipal election. In other words, Walker failed to produce a single witness who testified that he or she did not vote in the April 22 primary runoff election due to a lack of notice.

¶20.   Although Walker did present witnesses who testified that their names were not on the poll books, those witnesses admitted that they were allowed to vote by affidavit. Walker, however, testified that even those voters who voted by affidavit were disenfranchised because they voted by affidavit. But simply because a voter voted by affidavit does not disenfranchise him or her. As the circuit court properly noted, "[v]oting by affidavit does not deprive a voter of his right to vote, it simply changes his method of voting." And voting by affidavit is allowed under Mississippi Code Section 23-15-573, which states in relevant part as follows:

> (1) If any person declares that he or she is a registered voter in the jurisdiction in which he or she offers to vote and that he or she is eligible to vote in the election, but his or her name does not appear upon the pollbooks, or that he or she is not able to cast a regular election day ballot under a provision of state or federal law but is otherwise qualified to vote, or that he or she has been illegally denied registration, or that he or she is unable to present an acceptable form of photo identification:
>
> > (a) A poll manager shall notify the person that he or she may cast an affidavit ballot at the election.
> >
> > (b) The person shall be permitted to cast an affidavit

9

> ballot at the polling place upon execution of a written affidavit
> before one (1) of the poll managers[.]

Miss. Code Ann. § 23-15-573 (Rev. 2018).

¶21.   In support of her argument that a new election is warranted due to disenfranchisement, Walker relies on ***Barbour v. Gunn***, 890 So. 2d 843 (Miss. 2004).  But Walker's reliance on ***Barbour*** is misplaced because that case is distinguishable.

¶22.   In ***Barbour***, the circuit court "ordered that a new election be held in two precincts[.]" ***Id.*** at 844.  On appeal, the Court affirmed, finding:

> In the case sub judice, the problems are not "technical;" an entire sub-precinct was not allowed to vote. There can be no . . . interpretation of "the will of the voters," because those voters were never allowed to vote. . . . [T]he trial court appropriately ordered a revote in the excluded areas in complete accordance with procedures mandated by the Legislature. Because they were mistakenly not allowed to vote the first time, those voters were properly allowed to vote by the trial court.

***Id.*** at 847-48.

¶23.   Here, unlike in ***Barbour***, there is no evidence that "an entire sub-precinct was not allowed to vote." ***Id.***  Instead, as the circuit court noted, the evidence showed "that all the voters in the annexed area who went to the polls were allowed to vote by machine or affidavit ballot."  In other words, no evidence was presented that any voter in the annexed areas was deprived of his or her right to vote.  And as to Walker's assertion that "there are . . . hundreds [of voters] out there that had no knowledge that they could vote," Walker failed to produce one at trial.  Instead, Walker admitted that she has no evidence "that somebody wanted to vote [on April 22] [but] did not go to the polls" because of a lack of notice.

¶24.   "In a primary election contest, an election should be voided only if there has been such

10

a departure from statutory compliance 'as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain.'" *Waters v. Gnemi*, 907 So. 2d 307, 315-16 (Miss. 2005) (quoting *Riley v. Clayton*, 441 So. 2d 1322, 1328 (Miss. 1983), *overruled on other grounds by Lewis v. Griffith*, 664 So. 2d 177, 187 (Miss. 1995)). Walker has failed to show that the City's alleged failures regarding SEMS "destroy[ed] the integrity of the [April 22 primary runoff] election and ma[de] the will of the qualified electors impossible to ascertain." *Waters*, 907 So. 2d at 315-16 (quoting *Riley*, 441 So. 2d at 1328). Consequently, a new election based on alleged voter disenfranchisement is not warranted.

*II.     Equal Protection*

¶25.    Walker argues that "requiring the annexed voters to vote by affidavit violated their right to equal protection under the law." Specifically, Walker claims that "[a]dding an extra hurdle for voters in the annexed areas violates equal protection[.]" We disagree.

¶26.    Importantly, not all of the annexed voters were required to vote by affidavit. As the record reflects, only those registered voters whose names did not appear on the poll books voted by affidavit. And as previously noted, the circuit court correctly found that "[v]oting by affidavit does not deprive a voter of his right to vote[;] it simply changes his method of voting." While Wray admitted that "[a] person voting by affidavit does not take the same steps as a person voting on the machine," no testimony was presented that a vote by affidavit counted any less than a vote by machine.

¶27.    Notably, Walker fails to cite a single case from any court in support of her position that allowing voters to vote by affidavit infringes their constitutional right to equal

11

protection. And the cases she does cite are clearly distinguishable and inapplicable.

¶28.    In *Common Cause/New York v. Brehm*, Common Cause sued the New York State Board of Elections, its coexecutive directors, and its commissioners, alleging violations of the fundamental right to vote contained in the Fourteenth Amendment. *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 287 (S.D.N.Y. 2020). Common Cause challenged two of New York's election practices:

> First, the State regularly removes voters from active status and places them on inactive status if it believes that the voter has moved. The names of these inactive voters, however, are not provided to poll workers at polling locations. Second, the State prohibits inactive voters from voting by regular ballots, and instead requires them to vote using affidavit.

*Id.*

¶29.    The court found that the "State's refusal to provide the inactive [voters] list . . . violate[d] the Fourteenth Amendment." *Id.* at 310. The court, however, "reject[ed]" Common Cause's challenge that "the State's use of affidavit ballots [w]as unconstitutional," stating, "[a]lthough affidavit ballots impose burdens on voters, the State has multiple, weighty interests in using affidavit ballots and not permitting all voters who present themselves at the polls on Election Day to vote by regular ballot." *Id.* at 315. The court "conclude[d] that the State's affidavit-ballot process d[id] not violate the Fourteenth Amendment." *Id.* at 319.

¶30.    Here, as in *Brehm*, "the State has multiple, weighty interests in using affidavit ballots and not permitting all voters who present themselves at the polls on Election Day to vote by regular ballot." *Id.* at 315. Thus, despite Walker's assertion regarding "extra hurdles," her

equal protection argument fails.

¶31. In *Black v. McGuffage*, Latino and African-American voters in counties throughout Illinois filed a civil-rights class-action lawsuit alleging they "[we]re disproportionately forced to use—and are disproportionately injured when they use—the challenged voting systems." *Black v. McGuffage*, 209 F. Supp. 2d 889, 892 (N.D. Ill. 2002).[10] The court found that "Plaintiffs ha[d] sufficiently stated a claim against the Defendants for violation of equal protection." *Id.* at 899. The court explained:

> [T]he choice of voting system [was left] up to local authorities. But that choice necessarily means that some authorities will choose a system with less accuracy than others. As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.

*Id.* The court concluded that "[a]ny voting system that arbitrarily and unnecessarily values some votes over others cannot be constitutional." *Id.*

¶32. But here, unlike in *Black*, no evidence was adduced that the registered voters in the annexed areas who voted by affidavit were "statistically less likely to have their votes counted than voters in other [areas.]" *Id.* Moreover, Walker produced no evidence that the City's voting system "value[d] some votes over others[.]" *Id.* Instead, as the circuit court noted:

> Those who went out to vote were accommodated and allowed to vote, using the statutory method for situations such as these when the voter's name is not

---

[10] The challenged voting systems included "(1) punch card voting systems, (2) voting systems that lack effective error notification, and (3) voting systems with inadequate education of voters, inadequate training of and assistance from election judges, and inadequate ballot design." *Id.*

13

on the poll book. . . .

Affidavit votes are regularly cast in virtually every precinct in every election in Mississippi on a regular basis. Affidavit voting addresses the very common circumstance of voters not being found in the poll book for various reasons, such as a voter moving from one precinct to another, or if they have recently moved into the precinct, or, as here, if their status as a registered voter in SEMS has not yet been updated after an annexation. All simply vote by affidavit ballot.

[Walker] failed to prove the number of voters in the annexed area whose status was not updated in SEMS and argues without basis—only speculation—that virtually all were not included on the poll books. That is not the case. [Wray] stated she and [Anderson] had for more than a year, through a slow and frustrating process, added many, many of the annexed voters to SEMS and they were included in the poll books. No witness came forward to say otherwise. Thus, the argument that a vast number of annexed voters were excluded from the poll books, creating . . . a massive departure from accepted voting practices[,] was not prove[d].

(Footnotes omitted.)

### III.    Ballot Irregularities

¶33.    Walker was allowed to examine the ballot boxes after the April 22 primary runoff election, and she asserts the examination revealed the following ballot irregularities:

a) The Municipal Clerk did not store the tally list and absentee ballot envelopes in a sealed and secured ballot box as required by Miss. Code Ann. § 23-15-911. Instead, these materials were kept in an unsecured box which the Municipal Clerk referred to as "her personal box."

b) The affidavit ballots were not returned to sealed boxes for their specific precincts. They were stored together. . . .

c) The official election results were found unsecured which violates the requirement for tamper-evident preservation under Miss. Code Ann. § 23-15-911 and Miss. Code Ann. § 23-15-591.

d) Both accepted and rejected affidavit ballots were located in an unsealed box breaching the statutory chain-of-custody safeguards required for

14

affidavit ballots.

e) The supply bag in Ward 4 contained two spoiled county ballots from the November 2024 General Election evidencing a failure to properly segregate and account for prior election materials introducing potential contamination and confusion.

f) The Ward 1 ballot box lacked any receipts. Instead the receipts were found in the April 22, 2025, supply bag, violating statutory documentation and auditing requirements.

g) The Ward 2 supply bag contained two spoiled ballots which were not properly logged or segregated as required.

h) The Ward 1 ballot box also contained votes from the November General Election, including votes for Justice James Kitchens and his opponent (now Justice) [Jenifer] Branning.

i) The three-ring binders which contained the Ballot Accounting Form should have been placed in a sealed container.

j) According to the binder, the Red Bag was to contain multiple key items including the Affidavit Ballot Bag, the Spoiled Ballot Envelopes, and Challenged Ballot Envelopes yet this inventory was not documented, verified, or sealed.

k) Similarly, the Blue Bag was required to contain surge protectors, a power cord, and a router, but in certain precincts the Blue Bag also contained other things such as an affidavit book, a curbside book, receipts, and unused ballots.

l) The Municipal Clerk could not produce documentation showing the seal numbers affixed to the absentee ballot box on election night, further severing the chain of custody and compromising auditability.

m) In Ward 7, two small handwritten notes indicated that the printer ceased functioning. One stated the time as 6:58 p.m. on April 22, 2025. The other had no time on it. Both referenced the same malfunction raising material concerns about whether votes cast during the critical closing hour of the polls were properly recorded.

Walker argues that based on these irregularities, a special runoff election is warranted. We disagree.

¶34.    Mississippi Code Section 23-15-591 "governs the immediate post-election handling of ballot boxes by precinct poll managers." *Waters*, 907 So. 2d at 329. It provides as follows:

> When the votes have been completely and correctly counted and tallied by the poll managers they shall publicly proclaim the result of the election at their box and shall certify in duplicate a statement of the result, the certificate to be signed by the poll managers, one (1) of the certificates to be enclosed in the ballot box, and the other to be delivered to and to be kept by one (1) of the poll managers and to be inspected at any time by any voter who so requests. When the count of the votes and the tally of the votes have been completed, the poll managers shall lock and seal the ballot box, having first placed therein all ballots voted, all spoiled ballots and all unused ballots. There shall also be enclosed one (1) of the duplicate receipts given by the poll manager who received the blank ballots received for that box; and the total ballots voted, and the spoiled ballots, and the unused ballots must correspond in total with the duplicate receipt or else the failure thereof must be perfectly accounted for by a written statement, under oath of the poll managers, which statement must be enclosed in the ballot box. There shall also be enclosed in the box the tally list, the receipt book containing the signed names of the voters who voted; and the number of ballots voted must correspond with the number of names signed in the receipt book.

Miss. Code Ann. § 23-15-591 (Rev. 2018).

¶35.    Mississippi Code Section 23-15-911(1) "outlines the procedure for maintaining ballot box security both before and after a candidate exercises the right to examine the ballot boxes." *Waters*, 907 So. 2d at 329. Section 23-15-911(1) provides:

> (1)(a) When the returns for a box and the contents of the ballot box and the conduct of the election have been canvassed and reviewed by the county election commission in the case of general elections or the county executive committee in the case of primary elections, all the contents of the box required to be placed and sealed in the ballot box by the poll managers shall be replaced

16

therein by the election commission or executive committee, as the case may be, and the box shall be forthwith resealed and delivered to the circuit clerk, who shall safely keep and secure the same against any tampering. At any time within twelve (12) days after the canvass and examination of the box and its contents by the election commission or executive committee, as the case may be, any candidate or his or her representative authorized in writing by him or her shall have the right of full examination of the box and its contents upon three (3) days' notice of his or her application therefor served upon the opposing candidates. The service of notice shall be provided to each opposing candidate by delivering a copy personally to each candidate, or by performing two (2) of the following:

(i) By leaving a copy at each candidate's usual place of residence with a family member, who shall be no less than sixteen (16) years of age and, who resides in the candidate's residence;

(ii) By email or other electronic means, with receipt deemed upon transmission; or

(iii) By mailing a copy of the notice by registered or certified mail that is addressed to each opposing candidate at that candidate's residence with receipt deemed mailing.

(b) If service of notice cannot be made to any opposing candidate, then notice may be posted on the door of each candidate's usual place of abode. If any candidate's usual place of residence is a multi-family dwelling, a copy of the notice must be mailed to the candidate or candidates by United States first-class mail, postage prepaid, return receipt requested. Proof of service of notice upon any opposing candidate shall be made to the circuit clerk within three (3) days before a full examination of the ballot box may be conducted.

(c) The examination shall be conducted in the presence of the circuit clerk or his or her deputy who shall be charged with the duty to see that none of the contents of the box are removed from the presence of the clerk or in any way tampered with. Upon the completion of the examination the box shall be resealed with all its original contents inside. And if any contest or complaint before the court shall arise over the box, it shall be kept intact and sealed until the court hearing and another ballot box, if necessary, shall be furnished for the precinct involved.

Miss. Code Ann. § 23-15-911(1) (Rev. 2018).

¶36. Anderson testified that she distributed the ballot boxes and materials for the April 22 primary runoff election to the poll managers on April 21. Anderson explained that at that time, the chain-of-custody logs were generated and signed. The poll managers signed the chain-of-custody logs verifying "that the information that they were receiving and the serial numbers that w[ere] attached w[ere] correct." The next day, after the polls had closed, the poll managers attached different seals to the boxes, notated those seals on the chain-of-custody logs or accountability sheets, and then returned the sealed boxes and materials to the Canton Municipal Democratic Executive Committee. The executive committee "verified the seals with the numbers listed on the accountability sheet," and the sealed boxes and materials were then "stored in the [city clerk's] vault until the . . . ballot box examination." Anderson confirmed that no seals had been broken before the ballot-box examination.

¶37. Anderson testified that the seals on the ballot boxes were broken in order for Walker to conduct the examination but that "[a]ll of the [ballot] boxes were resealed" with new seals after the examination. Anderson explained that while she did not write down the information in her chain-of-custody log, she "applied [the new] seals [to the boxes] and provided the numbers to both candidates and their counsel." Notably, both candidates and their counsel were present for the ballot-box examination.

¶38. Walker's alleged irregularities are based on *her* examination of the ballot boxes. Walker cites little to no testimony from witnesses related to the allegations. For instance, despite Walker's allegations regarding unsecure tally lists and ballots, Wray testified that the ballot boxes should be maintained "[s]omewhere in the [City] under the control of the . . .

18

City Clerk" and that tally lists "need to be in a secure room controlled by the Clerk." Anderson testified that she kept all "very important documents and information for the City and election . . . stored" in a "huge steel iron vault" to which only she and her deputy clerks have access. Regarding affidavit ballots, Anderson testified that affidavit ballots are located in the "City Hall ballot box" because "affidavits . . . are opened the night of the election[.]" She explained that the only notation regarding affidavit ballots that would be located in a precinct's ballot box would be the booklet that was signed. That booklet, according to Anderson, includes "the address of the precinct, the date of the election, and . . . the receiving and returning poll manager, as well as the signatures of those [who] completed the affidavit ballot at the precinct." Notably, when asked by Walker's counsel, Anderson was able to answer, without hesitation or trouble, how many affidavit ballots were cast in Ward 4 based on her review of the ballot booklet contained within the Ward 4 ballot box. Regarding spoiled ballots or votes from other elections, i.e., the November 2024 General Election, Anderson explained that "the City and [Madison] County share these bags" and that "once [the City is] done with them, [the City] return[s] them back to [Madison] County. . . . So, obviously, this was content that was [inadvertently] left in there from [Madison] County[.]"

¶39.    As the circuit court noted:

> As for the 11 technical violations, most of which are either minor, such as failing to clean old voting paperwork accumulated in previous elections, or misfiling lists and spoiled ballot envelopes, both the city and circuit clerks testified those instances are common in virtually every election. This was confirmed by the Election Commissioners. The somewhat more serious allegations of affidavit ballots, absentee ballots, and official vote totals not being stored in secure boxes is considerably mitigated by testimony from the city clerk that all of the election paperwork is stored in a vault[.] . . .

19

> . . . .

> . . . Importantly, [Walker] failed to prove that any of these irregularities affected the outcome of the election in any manner and offered no theory as to how they could have done so.

¶40. In support of her position that a special runoff election should be ordered, Walker relies on *Waters*. But Walker's reliance on *Waters* in misplaced because that case is distinguishable.

¶41. In *Waters*, "Roy Anderson, James 'Danny' Gnemi and Debra Waters qualified to run" in the Democratic primary election for District Three Supervisor in Holmes County. *Waters*, 907 So. 2d at 310. Because no candidate received a majority vote after the first primary election, a second primary election was scheduled. *Id.* at 311. Before the second primary election was held, Gnemi requested an examination of the ballot boxes from the first primary election. *Id.* at 312. "Since there are six precincts in District 3, Gnemi, during the examination process . . . , expected to be presented with six metal precinct ballot boxes which had been sealed since the . . . primary." *Id.* Instead, Gnemi "was presented with two cardboard boxes containing commingled ballots and other election materials from the six metal precinct ballot boxes." *Id.* at 312-13. "When Gnemi inquired as to why these election materials were not still sealed in the metal ballot boxes, [the Holmes County circuit clerk] stated that the election materials from the first primary election had to be emptied into the two cardboard boxes so that the metal ballot boxes could be re-used for the upcoming second primary." *Id.* at 313.

¶42. After his ballot-box examination, Gnemi filed "an unsworn handwritten protest" with

20

the Holmes County Democratic Executive Committee (HCDEC). *Id.* The HCDEC denied Gnemi's protest, and Gnemi filed a sworn petition for judicial review in the circuit court. *Id.*

¶43. The circuit court found Section 23-15-911 had been violated and ordered a special primary runoff election between Waters and Gnemi. *Id.* at 314. Waters timely appealed to this Court. *Id.*

¶44. On appeal, the Court found that "several violations of election laws [had] occurred[.]" *Id.* at 330. First, the clerk "testified that she did not take possession of the ballot boxes the night of the election when the returning poll managers brought them back from the precincts." *Id.* In fact, the clerk "had no knowledge of the boxes' locale up to the time when Gnemi officially served notice on her and exercised his statutory right to examine the ballot boxes[.]" *Id.* And the clerk "expressly stated that she lacked any personal knowledge of and was not a witness to the removal of the contents from the six . . . precinct ballot boxes, or their collective dumping into two taped cardboard boxes." *Id.*

¶45. Additionally, "the cardboard boxes were never sealed." *Id.* at 331. Although the boxes "may have been sealed at one time, [they] were not only left unsealed and accessible, but their contents were commingled with the contents of the other District 3 boxes." *Id.*

¶46. The Court found that "the evidentiary value of the boxes' contents was completely lost and the ability of the county executive committee, the candidates, and the voting public to detect the existence of voter fraud and/or any other type of impropriety or miscalculations was lost." *Id.* at 335. As a result, the Court agreed that "a special primary election should be conducted[.]" *Id.*

21

¶47. Here, unlike in *Waters*, the testimony reflects that the clerk took "possession of the ballot boxes the night of the election when the returning poll managers brought them back from the precincts" and that the ballot boxes were sealed. *Id.* at 330. Indeed, as previously discussed, Anderson testified that the poll managers returned the sealed ballot boxes and that she stored the boxes in the secure vault until the ballot-box examination. Moreover, Anderson confirmed that no seals were broken before the ballot-box examination. Thus, unlike in *Waters*, "the evidentiary value of the boxes' contents was [not] completely lost" nor was "the ability of the county executive committee, the candidates, and the voting public to detect the existence of voter fraud and/or any other type of impropriety or miscalculations[.]" *Id.* at 335. As a result, contrary to *Waters*, a special runoff election is not warranted in this case.

## CONCLUSION

¶48. Walker's sworn petitions for judicial review of primary election contest were properly denied and dismissed. The circuit court's final judgment is affirmed.

¶49. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., ISHEE AND SULLIVAN, JJ., CONCUR. BRANNING, J., NOT PARTICIPATING.**